### IN THE UNITED STATES DISTRICT COURT FOR THE
### MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **JEFFREY LLOYD,** ) | |
| ) | |
| And ) | |
| ) | |
| **JERIKA LLOYD,** ) | |
| ) | **Civil Action No:** |
| And ) | |
| ) | |
| **J.L.,** ) | |
| ) | **Judge:** |
| *Plaintiffs*; ) | |
| ) | |
| v. ) | **Magistrate Judge:** |
| ) | |
| **RUTHERFORD COUNTY,** ) | |
| **TENNESSEE,** ) | |
| ) | |
| And, ) | |
| ) | |
| **DR. PHILLIP THOMAS,** ) | |
| ) | |
| And ) | |
| ) | |
| **VANDERBILT UNIVERSITY** ) | |
| **MEDICAL CENTER,** ) | |
| ) | |
| *Defendants*. ) | |

---

### COMPLAINT

---

1. Plaintiffs Jeffrey Lloyd ("Mr. Lloyd"), Jerika Lloyd ("Mrs. Lloyd"), and J.L. bring this action for damages against Defendants pursuant to 42 U.S.C. § 1983 and supplemental Tennessee state law claims, seeking compensation for the unwarranted five-month removal of J.L. from her home and her parents, Mr. and Mrs. Lloyd.

1

## PARTIES

2. Plaintiff Jeffrey Lloyd ("Mr. Lloyd") is an adult resident of Rutherford County, Tennessee. Mr. Lloyd is married to Plaintiff Jerika Lloyd, and is the father of Plaintiff J.L. and her older brother, J.L. #2.

3. Plaintiff Jerika Lloyd ("Mrs. Lloyd") is an adult resident of Rutherford County, Tennessee. Mrs. Lloyd is married to Plaintiff Mr. Lloyd, and is the mother of Plaintiff J.L. and her older brother, J.L. #2.

4. Plaintiff J.L. is a minor resident of Rutherford County, Tennessee. During the events at issue in this lawsuit, J.L. was an infant of less than one year in age.

5. Defendant Rutherford County, Tennessee ("Rutherford County") is a municipal government located in Rutherford County, Tennessee.

6. Defendant Dr. Phillip Thomas ("Dr. Thomas") is a medical provider who at all times pertinent to this lawsuit practiced medicine with Vanderbilt University Medical Center ("VUMC"). On information and belief, Dr. Thomas is a resident of Tennessee.

7. Defendant Vanderbilt University Medical Center ("VUMC") is a non-profit entity incorporated in Tennessee. VUMC's principal place of business is located in Davidson County, Tennessee.

## JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the state law claims in this matter pursuant to 28 U.S.C. § 1367. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(1) because the events at issue occurred in this district, and because Defendants are located in this district.

## FACTUAL BACKGROUND

### A. Plaintiffs' Background

9. Plaintiffs Mr. Lloyd and Mrs. Lloyd are a married couple who have resided in Rutherford County, Tennessee for their entire lives.

10. Mr. and Mrs. Lloyd married in 2014. They had their first child, a son referred to in this lawsuit as J.L. #2, in 2020. They had their second child, a daughter referred to as Plaintiff J.L., in early 2024.

11. Mr. Lloyd is a husband, a father, and a professional who, at the time that the incidents underlying this case began, served as a vice president of a corporation. Mr. Lloyd has no criminal record, and prior to the incidents at issue in this case had never been the subject of abuse allegations.

12. Mrs. Lloyd is a wife, a mother, and an entrepreneur with her own small business. Mrs. Lloyd has no criminal record, and prior to the incidents at issue in this case had never been the subject of abuse allegations.

13. Mr. and Mrs. Lloyd have two children – J.L., and her older brother J.L. #2.

14. At the time of the onset of the events at issue in this lawsuit, August 2024, J.L. #2 was four years old and J.L. was about six months old.

15. Both Mr. Lloyd's and Mrs. Lloyd's parents live nearby – Mr. Lloyd's in neighboring Cannon County, and Mrs. Lloyd's in Rutherford County. They routinely see their children and grandchildren, and often help out with their grandchildren.

16. Mr. and Mrs. Lloyd are both loving and devoted parents. Neither of them have never abused either of their children, or any other child.

3

## B.  J.L. – A Precocious Infant

17. J.L. was a precocious infant, developing both verbally and physically much faster than the average child.

18. J.L. began speaking her first words, which were "Mama" and "Dada," at about four months old.

19. J.L. began crawling and pulling up on objects and stairs at about five months old.

20.  Over the course of August 2024, Mrs. Lloyd took several videos on her cellphone of J.L.'s awkward efforts to learn how to move around.

21. Mrs. Lloyd took a video on August 2, 2024 showing that J.L. was still bound to her stomach, unable to lift herself vertically or move laterally.

22. Mrs. Lloyd took several videos on August 15, 2024, showing J.L. using a child seat to try to lift herself up to her feet.  In the videos, J.L. loses control and ultimately falls back down, landing awkwardly.

23. Mrs. Lloyd took two videos on August 16, 2024 – one showing J.L. successfully lifting herself to her feet by bracing herself against the infant seat, and the other showing J.L. losing control and awkwardly falling back down.

24. Mrs. Lloyd took three videos on August 17, 2024 showing J.L. continuing to work on lifting herself to her feet by bracing against the infant seat.  In all of the videos, J.L. continued to struggle to maintain control and repeatedly fell.

25. Mrs. Lloyd took a video on August 26, 2024, showing. J.L. continuing to work on learning to stand by bracing herself on the infant seat.

### C. Mrs. Lloyd takes J.L. to her pediatrician for a routine wellness check and immunizations visit

26. On August 27, 2025, Mrs. Lloyd took J.L. to see her primary care pediatrician, Dr. Bigham, for a routine checkup and immunizations.

27. J.L. received several shots in her legs from medical staff for her immunizations.

28. Dr. Bigham's notes reflected no other concerns at that time with regard J.L.'s health.

29. In particular, Dr. Bigham's chart reflected no "musculoskeletal" concerns.

30. After the appointment, the Lloyds noticed that J.L.'s legs had both formed knots at the sites where she had received her vaccinations – especially her right leg, which formed the bigger, more visible knot.

31. Mrs. Lloyd took a video on August 30, 2024, showing J.L. awkwardly learning to climb stairs, successfully scaling a stair but then losing control and rolling onto her bottom.

### D. Mrs. Lloyd takes J.L. back to see Dr. Bigham again

32. On August 31, 2024 – the Saturday before Labor Day – Mrs. Lloyd noticed that J.L. had stopped pulling up on the coffee table, and was avoiding putting weight on her leg.

33. On September 1, 2024 – a Sunday – Mrs. Lloyd noticed that J.L. seemed to be experiencing some pain, a mild fever, diarrhea and a runny nose. At the time, the Lloyds believed that the pain and other symptoms were likely due to the vaccinations J.L. had recently received in her legs.

34. Mrs. Lloyd called Dr. Bigham's clinic that day to see if she could get an appointment for J.L, but was told that the only provider available was a nurse practitioner – that there was no doctor, and no imaging available. So, she waited another day.

35. On September 2, 2024 – Labor Day – Mrs. Lloyd obtained an appointment for the morning of September 3, 2024 for J.L. to see Dr. Bigham.

36. On September 3, 2024, Mrs. Lloyd took J.L. to her appointment with Dr. Bigham.

37. At this point, Mr. Lloyd was out of state on a business trip.

38. Dr. Bigham ordered x-rays, which showed a hairline, "non-displaced" fracture on J.L.'s right fibula – one of the two bones that connects the knee to the ankle.

39. As Dr. Bigham would ultimately explain in his subsequent deposition testimony, the term "displacement" refers to the extent to which the bone is "out of line."

40. As Dr. Bigham would ultimately further explain, lower displacement indicates lower impact trauma, while higher displacement indicates higher impact trauma.

41. The x-rays showed no damage to any of J.L.'s other leg bones – her tibia, which is the other bone that connects the knee to the ankle, her femur (thigh bone), or her hip.

42. The radiology described the fibula fracture as an "Obliquely oriented minimally displaced fracture of the mid fibular diaphysis." The radiology notes continued, "Knee and ankle joints are adequately aligned. Physes are open. No cortical erosions or periosteal reaction. No lytic or blastic lesions."

43. The radiology notes also stated, "Note, while nonspecific an oblique fracture of diaphysis of the lower extremity in a **nonambulatory** child does raise concern for nonaccidental trauma." (emphasis added).

44. Dr. Bigham, who had also been J.L.'s older brother's pediatrician since birth, was very familiar with the Lloyd's and with J.L.

45. Indeed, Dr. Bigham had just seen J.L. the week before for her vaccinations and wellness check, and had noted no "musculoskeletal" concerns.

6

46. Bigham was also aware that J.L. – unlike the vast majority of six-month-olds – was not "non-ambulatory." Rather, J.L. was already pulling up on objects, moving across the floor, climbing stairs, and generally pushing the envelope of her mobility.

47. Understanding all of these background circumstances, and considering the nature of the fracture and the medical literature on abuse injuries, Dr. Bigham did not suspect that J.L.'s fracture was the result of abuse.

48. Rather, Dr. Bigham concluded that the most likely mechanism of injury was that J.L. had pulled up, and that she then awkwardly "fell on her butt."

49. As Dr. Bigham would ultimately explain in his deposition, he thus concluded that what made the most sense under the circumstances was that, "[J.L.] just fell and her leg was underneath her and it torqued."

50. Thus, in Dr. Bigham's treatment notes he reflected, "Refer to Ortho for evaluation, I do not suspect any intentional injury causing the fracture. Mom was appropriately upset when she found out she had a broken fibula."

51. Dr. Bigham referred Mrs. Lloyd to Tennessee Orthopedic Alliance to determine the best course of treatment for J.L., and sent the Lloyds on their way.

**E. Mrs. Lloyd seeks immediate treatment for J.L.**

52. Per Dr. Bigham's referral, Mrs. Lloyd contacted Tennessee Orthopedic Alliance ("TOA") immediately but was informed that TOA does not treat children under the age of three.

53. Mrs. Lloyd then called Vanderbilt Orthopedic in Murfreesboro, but was told that she would need a specific referral from a doctor in order to go there same day.

54. They said that she could make an appointment for the next day, however, Mrs. Lloyd did not want to delay J.L.'s treatment so she continued searching for other options.

7

55. Mrs. Lloyd then called the Williamson County Medical Center emergency room, and received a confirmation over the phone that the ER could put a cast on J.L.'s leg if a cast were determined to be warranted.

56. Mrs. Lloyd then took J.L. to the Williamson County Medical Center emergency room, so that J.L. could receive immediate treatment.

57. The ER doctor on site, Defendant Dr. Phillip Thomas, never actually examined J.L.

58. Dr. Thomas just looked at the x-ray report, accused Mrs. Lloyd of abuse, and said he would be contacting Child Protective Services ("CPS").

59. Dr. Thomas directed Mrs. Lloyd to take J.L. to the VUMC Monroe Carell Children's Hospital ("Monroe Carell") in Nashville.

60. Dr. Thomas did briefly speak with Dr. Bigham over the phone. Dr. Bigham told Dr. Thomas that it was not a case of child abuse, and attempted to explain why abuse was not suspected. Dr. Bigham further attempted to explain that because J.L. was an unusually ambulatory (but awkward) infant, it made sense that J.L. likely just hurt herself by accident. However, Dr. Thomas refused to listen to any of it, ignoring Dr. Bigham's additional information and perspective – in particular, the fact that unlike most six-month-olds, J.L. was not in fact "non-ambulatory."

61. Dr. Thomas threatened Mrs. Lloyd that if she did not immediately take J.L. to Monroe Carell, the police would be coming to their home to bring her and J.L. there.

62. Based on nothing other than the radiology report, Dr. Thomas then submitted a report to Child Protective Services, alleging a "Priority 1" case of child abuse based on a supposed "Lack of Supervision."

### F. Mrs. Lloyd takes J.L. to Monroe Carell

63. Terrified by Dr. Thomas's hostility and accusations, and still in need of treatment for her daughter, Mrs. Lloyd and her mother took J.L. directly to Monroe Carell.

64. At Monroe Carell, J.L. received dozens of additional x-ray examinations as well as blood draws – a very invasive and painful experience for an infant.

65. Mrs. Lloyd never refused any of the tests or blood draws, but did ask why the blood draws were necessary given how much they would hurt J.L.

66. One of the providers who conducted the additional testing, Dr. Daniel Himes, entered the following note in J.L.'s chart:

> "Was then sent to Williamson County and then transferred here for concern for NAT and unexplained fracture and **nonambulatory** child GCS had already been contacted both DCS and Murfreesboro police are here interviewing the family." (emphasis added).

67. Dr. Himes also entered this additional note:

> Here the child is happy and smiles I do not see any obvious external signs of trauma. No gross long bone deformities. No wounds. Tone appears normal.

68. Providers at Monroe Carell performed a full "skeletal survey," which indicated a "periosteal reaction" of the left fibula.

69. As Dr. Bigham would ultimately explain in his deposition testimony, a "periosteal reaction" is a "nonspecific term. You can see this with bone infections. You can see it with a healing fracture. You can see it just with trauma that didn't cause a fracture, but, again, if you got a six-month old that's hitting body weight, if it's a periosteal reaction and you're not seeing a heal -- if you're seeing a healing fracture, that would also be consistent with Janae being precocious or developmental six-month old."

70. In the VUMC documentation, this left fibula "small raised periosteal reaction" was reported to indicate a *possible* healing fracture.

71. As Dr. Bigham would ultimately testify, this "possible" left fibula fracture inference is "in a category of I heard a gunshot, I'm concerned somebody got murdered."

72. Dr. Bigham would further explain, "So it's not, you know, that would need more-- I can't say, yes, that was a fracture or, no, it wasn't a fracture, but all I can say is, yes, it's a periosteal reaction, but there was not anything that showed a fracture."

73. Dr. Bigham would further explain that, according to the relevant literature, "long bone fractures" like a fibula fracture are the "least concerning" for potential abuse.

74. Mrs. Lloyd, her mother, and J.L. stayed at Monroe Carell long into the night of September 3rd, even past midnight into September 4, 2024.

75. Several other medical providers saw J.L. that night.

76. No medical providers or tests indicated any bruising, bleeding, internal injuries, or other physical indicators of abuse.

77. The bloodwork testing that was conducted specifically tested for enzymes that would be indicators of abuse.

78. Dr. Hines, who analyzed the bloodwork, specifically concluded that there were no indicators of abuse in J.L.'s bloodwork.

79. One of the orthopedists who saw J.L. stated aloud that the fibula fracture was a common toddler injury, which occurs from toddlers falling.

80. All of the providers noted that J.L. was a happy, active baby. As Dr. Schoenecker put it in his notes, J.L. was *"Wiggling and grabbing both feet and moving them around throughout encounter. No superficial abrasions, lacerations, any external signs of trauma. Patient is*

very happy and babbling throughout the exam. Sitting up on mom's leg and moving both legs and arms for the entire time. Negative Ortolani and Barlow.[1] Stable hip exam bilaterally. Cooperative throughout exam. Not fussy at any point."

### G. DCS resolves Dr. Thomas's "Lack of Supervision" referral with a "Non-Custodial Family Permanency Plan"

81. DCS as well as police detectives responded to Monroe Carell, to assess J.L. and determine whether she was a victim of abuse.

82. The detectives met with J.L., saw no indicators of abuse, and informed DCS that J.L. seemed ok and that the detectives had no particular concerns at that time.

83. Dr. Hines reported to the DCS workers that the bloodwork did not indicate abuse, the fracture type was not a "classic" type of abuse injury, and that there were no immediate concerns for J.L. being abused.

84. However, notwithstanding the actual medical opinions that the "small raised periosteal reaction" on J.L.'s left fibula merely indicated a *possible* healing fracture, the DCS social workers and case workers assumed that J.L. in fact had two fractured legs.

85. With no other indicators of either a lack of supervision or abuse, and notwithstanding the numerous tests and observations that indicated a lack of abuse, DCS nonetheless took the position that the Lloyd's explanations for J.L.'s likely cause of injury – the same explanation that Dr. Bigham would ultimately testify "made the most sense" – were inadequate, and necessitated DCS's involvement.

86. However, at that point DCS did not seek to remove J.L. from her family – rather, with the support of the medical providers they offered to resolve the CPS referral with a "non-custodial permanency plan."

---

[1] "Ortolani" and "Barlow" are medical maneuvers designed to ascertain potential leg injuries in infants.

87. DCS's plan documentation noted that J.L.'s "Parents seem protective," that J.L. had "extended family support," and that the family had stable housing, stable income, and stable transportation.

88. DCS's plan documentation listed the only concerns with J.L.'s wellbeing as the fracture on J.L.'s right fibula, and the (supposed) healing fracture on her left fibula.

89. DCS's plan documentation listed the only actions required of the Lloyd's as being to take J.L. to her medical appointments, cooperate with DCS, and allow DCS to conduct home visits as part of a further investigation.

90. During the NCPP meeting, CM Eskridge explicitly stated that she believed it was in J.L.'s best interests to return home with her parents.

91. The agreement to the non-custodial plan was signed by Mrs. Lloyd, DCS Case Manager Eskridge ("CM Eskridge"), and DCS Case Manager Arnold ("CM Arnold").

92. Mrs. Lloyd, her mother, and J.L. then left Monroe Carell and went home.

## H. DCS tries to take J.L. in the middle of the night

93. A few hours after agreeing to the non-custodial plan, DCS's Regional Director instructed CM Arnold to require the Lloyds to agree to an "Immediate Protection Agreement" ("IPA") in lieu of the non-custodial plan – an IPA that would require that J.L. stay with her grandmother rather than her mother, and that would require any contact between J.L. and her parents to be supervised.

94. This supervision requirement was both unwarranted and onerous, particularly given J.L.'s tender age and her interconnectedness with her mother. At that time J.L. was exclusively

12

breastfeeding, with no other source of nourishment. If J.L. were cut off from her mother, she would quite literally go hungry.

95. The DCS workers insisted that Mrs. Lloyd meet with them immediately, in the middle of the night, to discuss their IPA demand.

96. DCS also called the Murfreesboro Police Department, to have police officers join the meeting.

97. CM Arnold, the police officers, Mrs. Lloyd, J.L., and Mrs. Lloyd's mother all met in Mrs. Lloyd's mother's driveway at approximately 2:30 A.M.

98. CM Arnold claimed that the IPA was being required because, supposedly, there was "no explanation" for J.L.'s injuries.

99. CM Arnold claimed that the IPA was necessary to "protect" J.L. from further injuries, and to "protect" the Lloyds from any further allegations.

100.    The Lloyds initially refused the IPA, insisting that DCS honor the signed non-custodial agreement.

101.    CM Arnold then informed Mrs. Lloyd that because she had refused to sign the IPA, DCS would be taking J.L. into custody immediately – meaning, foster care.

102.    Mrs. Lloyd asked the DCS case worker if they were going to let J.L. starve, since J.L. was still breastfeeding.

103.    CM Arnold responded that they would "figure it out when they get there."

104.    CM Arnold told Mrs. Lloyd that if she agreed to the IPA, J.L. could stay with Mrs. Lloyd's mother and Mr. and Mrs. Lloyd could have "supervised visits" with their daughter.

105.    However, CM Arnold indicated that these "supervised visits" could not include overnight visits – thus requiring that J.L. be unable to breastfeed at night.

13

106.     CM Arnold asserted that *only* the "CARE team" could determine whether the fracture was accidental or non-accidental, that the CARE team had yet not seen J.L., and that the Lloyds would need to wait two weeks for the CARE team determination before they could possibly have their daughter back.

107.     CM Arnold then asserted that there had never been a signed non-custodial agreement, claiming that the only documents that were signed were intake forms.

108.     CM Arnold had her supervisor on the phone, and handed the phone over to Mrs. Lloyd.

109.     The supervisor claimed that unless an explanation for the injuries could be demonstrated, DCS had to remove the child from the Lloyd's custody.

110.     The supervisor said that the Lloyds could have a copy of the documents that had been signed, but that the IPA demand needed to be resolved immediately.

111.     Mrs. Lloyd responded that she would consider the IPA, but only after being provided with a copy of the NCPP that had already been signed.

112.     The situation stalemated for several minutes, with DCS continuing to insist that Mrs. Lloyd either agree to the IPA on the spot or J.L. would be taken into foster care.

113.     Mrs. Lloyd asked the police officers on the scene to intervene.

114.     The officers, unsure of what to do, contacted their sergeant.

115.     While on the scene – at approximately 3:00 A.M. – DCS attempted to contact a judge to obtain an *ex parte* order authorizing DCS to take J.L. from her family immediately, without a hearing. However, DCS was unable to reach a judge at that late hour.

116.      The police on the scene told Mrs. Lloyd that without a court order, DCS could not take their children away.

117.     The police suggested that the Lloyd's have their lawyer contest the case.

118.     CM Arnold then reported that DCS had been unable to get in touch with Judge Lampley, that there would be a court hearing at 1pm the next day, and that DCS would be coming to get the kids in the "morning."

119.     Mrs. Lloyd then stated that she would rather agree to the IPA than for DCS to try to remove their children to state's custody.

120.     CM Arnold responded that the Lloyd's children were "already in state's custody," which they were not, and that court would be at 1pm that same day.

121.     The police officers on the scene stayed after to talk to Mrs. Lloyd. The officers were supportive of her, recommended that she get her lawyer ready to fight DCS, and said that if it came down to it the police would come to court.


### I.  Rutherford County's illegal "Preliminary Hearing" policy results in J.L. being taken from her parents

122.     On the morning of September 4, 2024, DCS filed a "Petition to Declare Children Dependent and Neglected, For a Finding of 'Severe Child Abuse' and for Emergency Legal Custody" seeking to immediately remove both J.L. and her older brother, J.L. #2, from their family.

123.     At no point in this process had anyone from DCS bothered to speak with Dr. Bigham about the case to get J.L.'s treating pediatrician's medical opinion regarding either the cause of the right fibula fracture, or the significance of the "small raised periosteal reaction" in J.L.'s left fibula.

124.     Likewise, no one from DCS bothered to discuss the report regarding the "small raised periosteal reaction" in J.L.'s left fibula with Dr. Bigham or any other actual medical

15

provider, and misinterpreted the report as indicating that J.L. did, in fact, have a "healing fracture" in her left fibula.

125.    The DCS petition was supported by an "Affidavit of Reasonable Efforts," signed under penalty of perjury by CM Arnold.

126.    DCS's petition and affidavit both explicitly acknowledged that Dr. Hines had told DCS that there was no immediate risk of abuse, but nonetheless included "boilerplate" language asserting, "[T]he above-named children is/are subject to an immediate threat to his/her/their safety to the extent that delay for a hearing would likely result in irreparable harm based on the facts set out in the above statement of facts and/or that the Child(ren) is about to be removed the jurisdiction of the Court."

127.    On September 4, 2024, at 1pm – just hours after DCS tried to take J.L. from her family in her grandmother's driveway – the Rutherford County Juvenile Court conducted a preliminary hearing on DCS's request for emergency removal.

128.    Under Tennessee law, articulated at T.C.A. § 37-1-114(a)(2) and Tennessee's Rules of Juvenile Procedure, a child can only be taken from their family on dependency/neglect allegations if a court makes three separate findings, which are:

   A.  Determine whether probable cause exists that the child is a dependent and
       neglected child; and

   B.  If probable cause is found, determine whether the child is subject to an
       immediate threat to the child's health or safety, or whether the child may
       be removed from the jurisdiction of the court; and

   C.  Determine whether any less drastic alternative is available to the removal
       of the child from the custody of the parent, guardian or legal custodian.

129.    Notwithstanding these requirements, at the time of the Lloyd's hearing – and still – Rutherford County maintained a local codified policy truncating preliminary hearings in

16

dependency and neglect cases, and directing county judicial officers to remove children from their families on a bare showing of probable cause – without any finding as to the other two TCA 37-1-114(a)(2) requirements.

130.     Thus, Rutherford County's policy states:

Preliminary Hearings shall be limited to two (2) hours. Each side will be allowed a maximum of sixty (60) minutes for opening, presentation of witnesses, cross-examination of adverse witnesses, and closing arguments. It is unnecessary for the Court to hear more of the Petitioner's proof than is necessary to establish probable cause, and the Court may terminate the hearing at any time that probable cause has been established and each Respondent has been afforded the opportunity to cross-examine the witnesses called by the Petitioner and to present defense proof reasonable tending to rebut probable cause.

131.     Notwithstanding the fact that the Lloyd's had just hours to prepare for the hearing, they arrived prepared. They had retained an attorney, Mr. Lloyd had managed to fly back to Tennessee on an early morning flight, and Dr. Bigham was available and ready to testify by telephone.

132.     At the outset of the hearing, the county magistrate judge explicitly acknowledged that Dr. Bigham was prepared to testify by phone, and that DCS had no objection to Dr. Bigham testifying by phone.

133.     DCS then presented its probable cause case, which was based on the mistaken premise that J.L. had *two* unexplained fibula fractures.

134.     The only witnesses that DCS called to testify were Mrs. Lloyd, CM Eskridge, and CM Arnold.

135.     DCS elicited extensive hearsay testimony about the supposed opinions of medical providers – however, much of the description of this hearsay was contested as between Mrs. Lloyd and the DCS case managers.

17

136.     At no point did DCS call any actual medical providers to testify, either to clarify or explain the various providers' alleged medical opinions.

137.     Thus, based CM Arnold's and CM Eskridge's negligent misunderstanding of the various medical providers' reports and opinions, they testified under oath that J.L. had *two* fractures.

138.     The county magistrate then explicitly cited Rutherford County's preliminary hearing policy and, based on the combination of that policy and the "two fractures" mistake, terminated the hearing.

139.     Thus, the county magistrate found probable cause based on the supposed premise that J.L. had "two unexplained fractures," and then – based on the county policy – ended the hearing without the need for findings regarding the other two legal prerequisites for removal, and took J.L. from her parents.

140.     Thus, because of this county policy the county magistrate did not permit either Dr. Bigham or Mr. Lloyd to testify to rebut the legal case for removing J.L. from her family pending the outcome of DCS's D&N petition.

141.     Both Mr. Lloyd and Dr. Bigham had valuable information, including Dr. Bigham's crucial medical perspective. If Dr. Bigham and Mr. Lloyd had not been precluded from testifying by the county's illegal preliminary hearing policy, their testimony would have rebutted at least some, and likely all, of the § 37-1-114(a)(2) elements – all of which, according to state law, must be in place for a child to be lawfully removed pending a D&N hearing.

142.    In particular, if Dr. Bigham had been permitted to testify he would have explained that from a medical standpoint there was only one documented fracture, and that the most likely mechanism of that fracture was J.L. falling on her butt.

143.    Mr. Lloyd, for his part, would have corroborated the level of care J.L. receives from her family, the total lack of any abuse, J.L.'s precocious efforts at early mobility, and J.L.'s routine falls during these halting mobility efforts.

144.    The county magistrate then moved on to the issue of where DCS would place J.L., and ultimately recommended that DCS place her with her grandmother.

145.    The county magistrate then imposed a supervision requirement on any contact between J.L. and her parents.  With regard to J.L.'s need to breastfeed, the magistrate required that her grandmother wake up in the middle of the night to supervise any late night breastfeeding that Mrs. Lloyd might provide.  Finally, the county magistrate forbade the Lloyd's from any co-sleeping with their infant child.

146.    At the conclusion of the hearing, the county magistrate noted that it had only been a probable cause finding, that probable cause is the lowest of the legal standards, and that an actual adjudication would require "clear and convincing evidence," which he described as the second highest legal standard.

147.    The county magistrate further stated that he would be willing to hear the case on an "expedited basis" if the CARE Team review did not corroborate the abuse allegation.

148.    The county magistrate did not order J.L.'s older brother removed, notwithstanding the fact that DCS's petition included him as well.

### J. Five days after the removal, J.L.'s injury is noted as healed

149.     On September 9, 2024, Mrs. Lloyd and her mother took J.L. to an appointment with another pediatric orthopedist, Dr. David Ebenezer.

150.     Dr. Ebenezer found that J.L. was basically already completely healed from her injury, noting, "Although she cannot walk independently, she is able to stand and balance while holding mom's hands in clinic for me today and take a few steps. She does not seem to be having any pain on weightbearing today."

151.     Dr. Ebenezer further noted, "She does not have any obvious swelling or deformity today on exam. Today she is really nontender to both legs over the fibulas."

152.     Dr. Ebenezer personally observed J.L.'s efforts at early mobility, reflecting the above-referenced passage in his notes as well as the fact that she was "cruising."


### K. A few days later, the CARE Team review fails to corroborate the abuse allegation

153.     On September 12 and 13, 2024, the CARE Team examined J.L., met with the Lloyd's, and conducted its review of J.L.'s injuries.

154.     The CARE Team's notes reflect that in reviewing the September 4th radiology examination of J.L.'s left fibula, "no fracture line" was observed.

155.     The CARE Team conducted a new skeletal survey of J.L., and found that the particular fracture pattern in J.L.'s right fibula, "bilateral symmetric mid-fibular fractures," would be "an unusual pattern for nonaccidental trauma."

156.     The CARE Team nonetheless concluded that without a specific explanation for the injury, non-accidental trauma could not be "ruled out."

157.     Thus, the CARE Team submitted some additional testing to check for "bone disease," and informed the Lloyd's that it would take 4 – 6 weeks to get results.

20

158.     Essentially taking the position that the Lloyd's were presumed to be guilty of abuse unless it could be definitively "ruled out," DCS continued prosecuting its unfounded "severe abuse" petition against the Lloyds even after the Care Team review.

## L.  The Lloyds are devastated by the forced separation of their family

159.     Reeling from the unwarranted forcible removal of their infant child from their home, Mr. Lloyd, Mrs. Lloyd, and J.L.'s older brother were devastated.

160.     Mr. Lloyd, who served as vice president of a company, was unable to fulfill his professional duties because of the distraction and emotional fallout of his daughter being removed and the ongoing DCS case.  Mr. Lloyd's work suffered, which eventually would lead to his demotion from his vice president position.

161.     Mrs. Lloyd, who had her own small business, was so emotionally distraught that she was basically unable to work. Her revenue would ultimately drop to essentially zero while dealing with the removal of her daughter and the ongoing DCS case.

162.     J.L.'s 4-year-old older brother, J.L. #2, was likewise devastated that his sister had been forced out of their home.  With no capacity to understand what was happening, J.L. #2 grieved the loss and yearned for the restoration of his family.

## M. DCS stalls the resolution of the Juvenile Court case

163.     Between the date of the CARE team visit and October 17, 2024, the Lloyds heard literally nothing from DCS.

164.     DCS conducted no home inspection, no interviews with neighbors, and no interviews with other extended family or friends.

165.     On October 17, 2024, with no new tests or evidence having corroborated DCS's original unfounded abuse allegation, the Lloyd's attorney filed a motion to dismiss DCS's D&N petition.

166.     The next day, a DCS investigator called the Lloyds and said that they wanted to enter the Lloyds' home to gather information in order to present an abuse case to the District Attorney for criminal prosecution.

167.     The Lloyds consulted with their attorney, and then – because of the explicitly criminal nature of the investigation – refused to consent without a search warrant.

168.     A DCS case worker trainee then met with the Lloyd's.  Remarkably, the trainee actually took time to get to know the Lloyds and their children.

169.     The Lloyds worked with the DCS case managers to develop and ratify a "permanency plan," with a goal of reunifying the family.

170.     In the meantime, on October 21, 2024, the Lloyds brought J.L. to a follow-up pediatric orthopedic appointment with Dr. Ebenezer.

171.     Dr. Ebenezer found that J.L. was completely healed, and he released her from any further medical care for the fibula injury.

172.     A Juvenile Court hearing was set for October 24, 2024 to ratify the proposed permanency plan.

173.     The Lloyds and their attorney attended the ratification hearing in person, hopeful that they would be able to get a court date of November 5, 2024 for their "adjudication hearing" – a trial on DCS's severe abuse petition.

22

174. However, DCS protested that it was not ready to go forward with even the ratification hearing. DCS successfully delayed the ratification hearing to November 11, 2024 – and the adjudication hearing to January 24, 2025.

### N. DCS prohibits J.L. from spending Christmas at home with her family

175. None of the medical or CARE Team follow-up examinations revealed any additional information corroborating the theory that J.L.'s fracture had been the result of some kind of abuse.

176. Nonetheless, DCS prosecuted the "severe abuse" petition against the Lloyds throughout the winter of 2024, essentially requiring the Lloyds to prove themselves innocent in order to overcome DCS's assumption of abuse.

177. At a DCS "Child Family Team Meeting" in December 2024, all in attendance – the family members and the DCS case workers assigned to the case – agreed that it would be in J.L.'s interests to be able to spend Christmas at home with her parents and brother.

178. The parties left this meeting with a written agreement in place that J.L. would be permitted to do this.

179. However, after the meeting DCS superiors countermanded the agreement, revoking the "Christmas pass" and insisting that J.L. remain with her grandmother, with only supervised visitation permitted to her parents.

### O. Dr. Bigham gives a deposition explaining why DCS's abuse suspicions were wrong

180. On January 3, 2025, Dr. Bigham testified in a deposition in connection with the Lloyd's juvenile court proceedings.

181.    Dr. Bigham testified to the opinions he would have shared back during the September 4, 2024 preliminary hearing, if Rutherford County's preliminary hearing policy had not truncated the hearing and precluded him from testifying.

182.    As described earlier in this complaint, Dr. Bigham explained that he did not suspect that J.L. was the victim of abuse, explained why he did not suspect that J.L. was the victim of abuse, and explained that he thought that the most likely cause of J.L.'s right fibula fracture was that she had "fallen on her butt."

183.    Dr. Bigham also explained that the radiology report had not indicated that J.L. had a fracture in her left fibula – only that she had a periosteal reaction, which can sometimes result from a fracture but which can also have other causes.

### P.  The Juvenile Court dismisses DCS's "severe abuse" petition

184.    Even after Dr. Bigham explained under oath why DCS's suspicions were wrong, DCS nonetheless persisted in trying to prosecute its petition.

185.    The Juvenile Court conducted a trial across three separate dates.

186.    Most of the proof was heard on January 24, 2025.  However, with the proof almost complete the Court reset the case to January 27, 2025 for a second day.

187.    On January 27, 2025, the parties and their attorneys showed up prepared to complete the trial.  However, the county magistrate assigned to the case inexplicably failed to appear for the hearing – thus, the hearing was reset to January 31, 2025.

188.    On January 31, 2025, the Court heard about ten minutes of testimony and argument, found that DCS had failed to prove its allegations of abuse, and then ordered the case dismissed.

24

## CLAIMS FOR RELIEF

### COUNT I: PROCEDURAL DUE PROCESS IN
### VIOLATION OF FOURTEENTH AMENDMENT OF THE U.S. CONSTITUTION
### (42 U.S.C § 1983)

### (DEFENDANT RUTHERFORD COUNTY)

189.     Plaintiff hereby reincorporates paragraphs 1 – 188 by reference.

190.     Under Tennessee law and the Fourteenth Amendment, Plaintiffs had a procedural

due process right for J.L. to not be taken from her parents in the absence of a finding that

all three of the T.C.A. § 37-1-114(a)(2) requirements were present.

191.     Rutherford County has a codified policy of illegally truncating dependency and

neglect preliminary hearings, depriving parents and children of two out of three of the

state law prerequisites for removing children from their families.

192.     Pursuant to Rutherford County's preliminary hearing policy, Plaintiffs were

precluded from calling Dr. Bigham to testify. If Dr. Bigham had been able to testify, he

would have negated probable cause of abuse by explaining that there was only one

fracture, not two, and by explaining that the most likely cause of J.L.'s right fibula

fracture was that she had "fallen on her butt."

193.     Pursuant to Rutherford County's preliminary hearing policy, the element of

whether there was an immediate risk of abuse was never considered – rather, the county

magistrate was directed to remove J.L. on a bare showing of probable cause.

194.     If Plaintiffs had been able to present their case at the preliminary hearing, they

would have negated the Tennessee legal requirements for removing J.L.

195.    Therefore, the Rutherford County preliminary hearing deprived Plaintiffs of their state created liberty interest in a full T.C.A. § 37-1-114(a)(2) hearing, and proximately caused the illegal removal of J.L. from her parents.

196.    Plaintiffs were damaged emotionally, and damaged financially by the illegal removal of J.L. from her parents and resulting consequences.

### COUNT II: GROSS NEGLIGENCE IN ABUSE REPORTING
### (TENNESSEE TORT LAW)

### (DEFENDANTS THOMAS AND VUMC)

197.    Plaintiff hereby reincorporates paragraphs 1 – 188 by reference.

198.    Defendant Thomas, the Williamson ER doctor who made the "Priority 1" referral to CPS for a supposed "Lack of Supervision," was grossly negligent in making this report.

199.    As J.L.'s treating ER physician, Defendant Thomas owed Plaintiffs a duty of care in the making of this report.

200.    Defendant Thomas jumped to the assumption abuse based on the bare radiology report, grossly violating his duty of care to Plaintiffs. In making the decision to report Defendant Thomas never even examined J.L., did not even bother to learn that J.L. was unusually ambulatory for her age, and did not listen to Dr. Bigham when he attempted to explain the reality of the situation and likely cause of J.L.'s injury.

201.    Defendant Thomas's grossly negligent "Priority 1" CPS report set the DCS process in motion, proximately causing the injuries Plaintiffs suffered as a result of being split apart as a family.

202.    Defendant VUMC, as the operator of the Williamson ER clinic and as Dr. Thomas's employer, is vicariously liable for his torts committed in the course of his duties at Williamson ER.

203.    Plaintiffs suffered emotional and financial injuries as a result of being split apart as a family.

## REQUEST FOR RELIEF

WHEREFORE, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this matter be tried by a jury.

3. That judgment for Plaintiffs enter against the Defendants on each count.

4. That Plaintiffs be awarded compensatory and punitive damages in an amount to be determined by a jury.

5. That Plaintiffs be awarded their attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

6. That Plaintiffs be awarded pre- and post-judgment interest.

7. That the court costs in this matter be taxed to Defendants.

8. That Plaintiffs be awarded all other relief to which they may be entitled in the interests of justice.

Respectfully submitted,

*s/ Kyle Mothershead*
*s/ Aaron Rothbaum*

Kyle Mothershead, BPR 22953
Aaron Rothbaum, BPR 36572
Relentless Advocacy, PLLC
7000 Executive Center Drive, Suite 240
Nashville, TN 37027
T: (615) 891-3901 / F: (615) 229-6387
E: [kyle@relentlesslaw.com](mailto:kyle@relentlesslaw.com)
E: [aaron@relentlesslaw.com](mailto:aaron@relentlesslaw.com)